1
2
3
4
5
6
7
8
9        IN THE UNITED STATES DISTRICT COURT
10       FOR THE EASTERN DISTRICT OF CALIFORNIA
11
12   GEORGE DENNIS ROUNDS,
13                                          No. 2:07-cv-01670-MMM
14               Petitioner,
15
16       vs.
17
18   DENNIS K. SISTO, WARDEN, ET AL.,
19                                          ORDER DENYING
20               Respondents.              PETITION FOR WRIT OF
21                                          HABEAS CORPUS
22
23
24       George Rounds is a California state prisoner, serving a fifteen years to life

25   sentence for second degree murder, attempted murder, and being armed with a

26   deadly weapon.  He brings this 28 U.S.C. § 2254 habeas petition to challenge the

27   2006 decision of the Board of Parole Hearings ("the Board") finding parole

28   ineligibility on due process and Eighth Amendment grounds.  Because the Board's

29   decision is supported by "some evidence" of Rounds' current dangerousness, his

30   primary due process challenge to his parole denial fails.  See Hayward v. Marshall,

31   603 F.3d 546, 562-63 (9th Cir. 2010) (en banc).  Rounds' other procedural due

1   process and Eighth Amendment challenges to his parole denial also fail.

2                                    **BACKGROUND**

3          In 1983, Rounds was convicted of the second-degree murder of Alonzo

4   Graham and attempted murder of Thomas Graham, his step-uncles, as well as a

5   two-year enhancement for being armed with a deadly weapon.  Rounds was

6   sentenced to fifteen years to life.  Ans. Ex. 1; Ex. 2 at 5-9, 26.  Although the basic

7   facts of the crime are uncontested, the record includes two different accounts of the

8   murder.  On the day of the murder, Alonzo and Thomas' brother, David, hired

9   Rounds, who was eighteen at the time, to wash his car.  According to the probation

10  officer's report, when Rounds realized that David was not going to pay him, he

11  went home, retrieved a gun, returned to the scene, and shot the Grahams.  Rounds

12  hit Alonzo in the neck and killed him and hit Thomas three times in the torso.

13  Rounds fled the scene and later turned himself in to authorities.  Ans. Ex. 2 at 5-6.

14         At his 2006 parole hearing, Rounds denied that the dispute was over money.

15  According to Rounds, he and Thomas began arguing when Rounds got some water

16  on Thomas' car.  Thomas and David left the scene while Rounds waited for them

17  to return with his money.  When they came back, the argument resumed, and

18  Thomas threatened Rounds.  Rounds ran home, obtained the gun, and returned to

19  the scene.  By this time, Alonzo had arrived as well, and a fight broke out.  Rounds

1   began firing and shot the Grahams.  Ans. Ex. 2 at 7, 10-16.

2        Rounds was denied parole at ten parole hearings between 1983 and 2006.

3   Pet. at A-12-A28.  At his July 26, 2006 hearing, the Board found Rounds

4   unsuitable for parole and denied parole for two additional years.  Ans. Ex. 2 at 86.

5   The Board based its decision on a number of factors, including the nature and

6   gravity of Rounds' offense; his disciplinary record; his lack of remorse and failure

7   to understand his crime; and his history of unstable relationships.  Ans. Ex. 2 at 87-

8   90.  The Board's decision became final on November 23, 2006.  Ans. Ex. 2 at 92.

9        Rounds filed a habeas petition challenging his parole denial in Riverside

10   County Superior Court.  The court denied the petition on March 13, 2007, finding

11   that the Board's decision was supported by "some evidence" and thus consistent

12   with the California Constitution.  Ans. Ex. 3 at 1.  The California Court of Appeal

13   summarily denied Rounds' petition on May 3, 2007, Ans. Ex. 4, and the California

14   Supreme Court denied Rounds' petition for review on May 10, 2007.  Ans. Ex. 5.

15        Rounds filed a habeas petition in this court on August 15, 2007. [Dkt. # 1].

16   On May 11, 2009, this court administratively stayed proceedings pending the Ninth

17   Circuit's decision in Hayward, which was filed on April 22, 2010.  [Dkt. # 13].

18                          **STANDARD OF REVIEW**

19        Under the look-through doctrine, the California Supreme Court's summary

1    denial is deemed to rest on the same grounds as the superior court's

2    decision—namely, the finding that Rounds' parole denial is supported by "some

3    evidence." See Ylst v. Nunnemaker, 501 U.S. 797, 804-05 (1991).  Under the

4    Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No.

5    104-132, 110 Stat. 1214, the court does not subject the state court's rulings on

6    questions of law and mixed questions of law and fact to de novo review.  Instead,

7    AEDPA permits relief only if the state court's decision was "contrary to, or

8    involved an unreasonable application of, clearly established Federal law as

9    determined by the Supreme Court." 28 U.S.C. § 2254(d)(1); see also Williams v.

10   Taylor, 529 U.S. 362, 400, 407-09 (2000).

11       The "unreasonable application" standard is "highly deferential," Lindh v.

12   Murphy, 521 U.S. 320, 333 n.7 (1997), requiring that the writ issue only where the

13   state court's application of federal law was "objectively unreasonable," and not

14   merely incorrect.  Williams, 529 U.S. at 409-11.  In addition, the reviewing court

15   may overturn a state court decision on factual grounds only where the court made

16   "an unreasonable determination of the facts in light of the evidence presented in

17   the State court proceeding." 28 U.S.C. § 2254(d)(2).  A state court's factual

18   findings are presumed to be correct unless that presumption is rebutted by clear

19   and convincing evidence." 28 U.S.C. § 2254(e)(1).

1              ANALYSIS

2  I.    WHETHER ROUNDS' PAROLE DENIAL IS SUPPORTED BY "SOME EVIDENCE"
3        (CLAIM 6)
4
5        A.    HAYWARD V. MARSHALL

6        Rounds argues that the Board's finding that he is unsuitable for parole is

7  unsupported by the evidence and thus violates his due process rights.  Pet. at 6;

8  Memo at 13-16.  In Hayward, the Ninth Circuit recently established the framework

9  for federal review of California state parole decisions.  603 F.3d at 562-63.  The

10 petitioner in Hayward argued that federal constitutional law imposed a "some

11 evidence" requirement on a state parole denial.  Id. at 549.  The court rejected this

12 claim, holding that "in the absence of state law establishing otherwise, there is no

13 federal constitutional requirement that parole be granted in the absence of 'some

14 evidence' of future dangerousness or anything else."  Id. at 561.  The court also

15 declined, on constitutional avoidance grounds, to address whether the California

16 parole statute provides a predicate liberty interest for imposing a "some evidence"

17 requirement as a matter of federal due process.  Id. at 562.

18        Instead, the court invoked two decisions by the California Supreme

19 Court—In re Lawrence, 190 P.3d 535 (Cal. 2008), and In re Shaputis, 190 P.3d

20 573 (Cal. 2008)—holding, as a matter of state constitutional law, that "'some

1     evidence' of future dangerousness is indeed a state *sine qua non* for denial of

2     parole in California." Hayward, 603 F.3d at 562. The court characterized the

3     California decisions in the following terms:

4         As a matter of California law, "the paramount consideration for both
5         the Board [of Prison Terms] and the Governor under the governing
6         statutes is whether the inmate currently poses a threat to public
7         safety." There must be "some evidence" of such a threat, and an
8         aggravated offense "does not, in every case, provide evidence that the
9         inmate is a current threat to public safety." The prisoner's aggravated
10       offense does not establish current dangerousness "unless the record
11       also establishes that something in the prisoner's pre- or
12       post-incarceration history, or his or her current demeanor and mental
13       state" supports the inference of dangerousness. Thus, in California,
14       the offense of conviction may be considered, but the consideration
15       must address the determining factor, "a current threat to public
16       safety."

17

18   Id. at 563 (citations omitted). Accordingly, the task for district courts adjudicating

19   the habeas claims of California inmates is to "decide whether the [parole denial]

20   was an 'unreasonable application' of the California 'some evidence' requirement,

21   or was 'based on an unreasonable determination of the facts in light of the

22   evidence.'" Id. (quoting 28 U.S.C. § 2254(d)(1) & (d)(2)).

23       Although the en banc court expressly sought to avoid reaching federal

24   constitutional issues, see id. at 562, Ninth Circuit decisions applying Hayward

25   have defined its holding under federal constitutional law. In Pearson v. Muntz, the

26   court explained that "[b]y holding that a federal habeas court may review the

6

1    reasonableness of the state court's application of the California 'some evidence'

2    rule, <u>Hayward</u> necessarily held that compliance with the state requirement is

3    mandated by federal law, specifically the Due Process Clause." 606 F.3d 606, 609

4    (9th Cir. 2010). As the court explained at length:

5         Through its state statutory and constitutional law, California has
6         created a parole system that independently requires the enforcement of
7         certain procedural and substantive rights, including the right to parole
8         absent "some evidence" of current dangerousness. California law
9         gives rise to a liberty interest on the part of its prisoners covered by its
10        parole system. Having guaranteed the prisoners of the state that they
11        will not be denied a parole release date absent "some evidence" of
12        current dangerousness, California is not permitted under the federal
13        Constitution arbitrarily to disregard the "some evidence" requirement
14        in any particular case.
15
16    <u>Id.</u> at 611. <u>See also</u> <u>Cooke v. Solis</u>, No. 06-15444, slip op. at 16 (9th Cir. 2010)

17    (explaining that "California's 'some evidence' requirement is a component of the

18    liberty interest created by the parole system of that state").

19        Under this federal law hook, the "some evidence" safeguard is a component

20    of California inmates' liberty interest. In other words, by requiring habeas courts

21    to review parole denials for compliance with California's "some evidence" rule,

22    <u>Hayward</u> apparently holds that California state constitutional law creates a

23    cognizable interest in parole absent "some evidence" of dangerousness, and that

24    the federal Due Process Clause in turn incorporates that right as a matter of clearly

7

1      established federal law.  Hayward, 603 F.3d at 569 (Berzon, J., concurring in part

2      and dissenting in part) (reading the "majority to rely on the California Supreme

3      Court's articulation of state constitutional requirements in determining what the

4      federal Constitution requires" and reasoning that federal due process requires

5      courts to "to review the state court decision . . . for compliance with the California

6      Constitution's requirement of 'some evidence' of future dangerousness").

7      Accordingly, the following analysis considers, under Hayward, whether the

8      Board's decision constituted an unreasonable application of the "some evidence"

9      rule.

10     **B.      APPLICATION OF CALIFORNIA'S "SOME EVIDENCE" REQUIREMENT**
11
12             The Board based its parole denial on several grounds.  The Board first found

13     that Rounds' offense was carried out in "an especially cruel and callous manner."

14     Ans. Ex. 2 at 88; see also CAL. ADMIN. CODE tit. 15, § 2402(c)(1) (providing that

15     an "especially heinous, atrocious or cruel" commitment offense weighs against a

16     finding of parole suitability).  As the Board explained:

17             the victims had recently been drinking with you and were arguing
18             with you.  Multiple victims were attacked, injured or killed in the
19             same incident.  Alonzo Gra[ham], a 29-year-old male was murdered,
20             Thomas Gra[ham], his brother was shot three times in the upper torso
21             in an attempted murder, and Tony Ragsdale was slapped with the
22             barrel of the gun.  The offense was carried out is a dispassionate and
23             calculated manner, in that the inmate, you, went to your home,

8

1    obtained a weapon, returned to the scene and began shooting at the
2    Gra[ham] brothers.  And the offense was carried out in a manner
3    demonstrating exceptionally callous disregard for human suffering,
4    the fact that [sic] [Thomas Graham] was shot three times and was
5    begging for his life.  Public safety was at risk from the gunfire in the
6    neighborhood.  You had clear opportunity to cease but you continued.
7    Moreover, the motive for the crime is simply inexplicable.  Your act
8    in going and getting a weapon and returning to shoot two family
9    members is simply inexplicable.

Ans. Ex. 2 at 88-89.  The Board also found that Rounds "lack[ed] insight into [his]

criminality," had a "history of unstable relationships," and that his "gains in

disciplinary free behavior [were] relatively recent."  Ans. Ex. 2 at 87, 89.  In the

Board's view, Rounds was still a "public safety risk."

On the positive side, the Board noted that Rounds had "programmed in a

limited manner during incarceration," obtaining his GED, serving as a "lawbot

tutor" and teacher's assistant, and obtaining and maintaining his certification as a

radiology technician, which gave him a marketable skill.  Although Rounds lacked

concrete employment plans, he did have a viable residential plan to live with

relatives if released.  The Board commended Rounds for "participat[ing]

extensively in self-help and therapy" and other prison programs.  It also noted that

Rounds had been discipline-free since 2001 and that a 2003 psychological report

assessed him as posing a low risk of dangerousness.  Ans. Ex. 2 at 87-88.

Nevertheless, in the Board's view, these factors were insufficient to defeat its

9

1    finding of parole unsuitability.

2         In In re Lawrence, the California Supreme Court explained that, although

3    Board decisions are entitled to deference, "a particularly egregious commitment

4    offense" does not categorically justify a parole denial in the absence of an adequate

5    finding of current dangerousness.  190 P.3d at 539.

> [A]lthough the Board . . . may rely upon the aggravated circumstances
> of the commitment offense as a basis for a decision denying parole,
> the aggravated nature of the crime does not in and of itself provide
> some evidence of *current* dangerousness to the public unless the
> record also establishes that something in the prisoner's pre- or
> post-incarceration history, or his or her current demeanor and mental
> state, indicates that the implications regarding the prisoner's
> dangerousness that derive from his or her commission of the
> commitment offense remain probative to the statutory determination
> of a continuing threat to public safety.

17   Id. at 555.  The primary, though not exclusive, basis for the Board's determination

18   of parole unsuitability is the cruel and heinous nature of Rounds' crime.  See Ans.

19   Ex. 2 at 86-87, 88-89.  The question then is whether the other factors for parole

20   unsuitability indicate that the heinous nature of Rounds' commitment offense is

21   still "probative" of the risk he poses to public safety.

22              **1.     Remorse and understanding of the crime**

23        The Board identified several factors linking Rounds' offense to his present

24   dangerousness.  First, the Board found that Rounds "lack[ed] insight into [his]

1    criminality." Ans. Ex. 2 at 89; see also In re Shaputis, 190 P.3d at 584-85. The

2    court finds that this is an "unreasonable determination of the facts in light of the

3    evidence." 28 U.S.C. § 2254(d)(2). The record—which primarily consists of the

4    transcript of Rounds' parole hearing—is replete with evidence of Rounds' remorse

5    and his understanding of the nature and magnitude of his offense. See CAL.

6    ADMIN. CODE tit. 15, § 2402(d)(3). Speaking of his anger on the day of the crime,

7    Rounds testified: "I should have went and talked, I should have had counseling, I

8    should have dealt with a lot of issues that were inside." Ans. Ex. 2 at 26.

9    Describing the impact of his actions on his family, he explained:

10       I know it hurt [my sisters] because . . . I'm sure they felt betrayed . . . .
11       [T]hey felt that I should have had more control, and I should have had
12       more control . . . . I know that I'm a reminder to the victims of that
13       tragic day . . . and I know that what I felt when my cousin died, that's
14       what they felt . . . . I know that when they see me . . . it brings back
15       those feelings and I'm sure a lot of them are still angry and they have
16       reason to be, and a lot of them are still hurt, and they have reason to
17       be. And what I've done, to try to [do] . . . is change me.
18
19    Id. at 27-28. Rounds' wife, Cassandra, similarly attested to his remorse in a letter

20    supporting his parole. Id. at 53.

21       This record contrasts with the record in In re Shaputis, where the California

22    Supreme Court upheld a parole denial based in part on Shaputis' failure to grasp

23    the nature of his commitment offense. Although Shaputis stated that his conduct

11

1    was "wrong" and that he felt "some remorse" for his crime, he still claimed that his

2    wife's brutal murder was an "accident" and sought to minimize his responsibility.

3    In addition, recent psychological reports indicated that Shaputis' character

4    remained unchanged and that he was "unable to gain insight into his antisocial

5    behavior despite years of therapy and rehabilitative programming." In re Shaputis,

6    190 P.3d at 584-85 (internal quotation marks omitted); see also id. at 585 n.18.

7          In contrast, Rounds "participated extensively in self-help and therapy," Ans.

8    Ex. 2 at 87, in programs such as "Kairos [a prison ministry], Alcoholics

9    Anonymous, Breaking Barriers, Vital Issues, [and] Alternatives to Violence." Id.

10   at 34.  His psychological evaluation by Dr. Paul Taylor in 2003 reported that he

11   "admi[tted] to the crime and show[ed] remorse" and scored him as presenting a

12   "low" risk of dangerousness if released from prison. Id. at 49, 88.   Although

13   Rounds denied that he initially intended to use the gun when he brought it to the

14   scene of the crime, id. at 7, and described not "really know[ing] what [he] was

15   thinking" when he pulled the trigger, id. at 16, neither of these statements show a

16   lack of remorse or a failure to appreciate the significance of his offense.

17          **2.     History of unstable relationships**

18          Second, the Board found that Rounds had a "history of unstable

19   relationships" that made him a danger to others.  The Board found that "certainly

12

1  being a father at 15 is not a history of stable relationships; and, in fact, there is

2  considerable evidence that you had unstable relationships with certain portions, at

3  least with your extended family, for a considerable period of time that actually led

4  up to this commitment offense." Ans. Ex. 2 at 87; CAL. ADMIN. CODE tit. 15,

5  § 2402(c)(3) (providing that an "[u]nstable social history" weighs against a finding

6  of parole suitability).

7       Rounds was born on September 14, 1963 to George and Madeleine Rounds

8  in Riverside, California. Rounds' parents divorced when he was six years old.

9  Ans. Ex. 2 at 21. Before he moved in with his father in 1975, he lived with a series

10 of relatives, including his grandmother, uncle, and various aunts, and his father

11 was largely absent. For two years, he attended Jim Jones' church, and his aunt

12 died in the Jamestown massacre. One of his cousins was murdered in 1978. Id. at

13 23-25. Rounds was also a father by age fifteen. Rounds testified that, at the time

14 of the crime, he and his girlfriend had just bought an apartment, he had some

15 savings, and he was intending to get a job to support his family. Id. at 17-18.

16      Rounds has repaired several family relationships and developed new ones.

17 See CAL. ADMIN. CODE tit. 15, § 2402(d)(2) (providing that the experience of

18 "reasonable stable relationships with others" is a factor tending to show parole

19 suitability). Odessa, Rounds' step-mother and the sister of Rounds' victims, has

forgiven him for his crime and wrote a letter in support of Rounds' parole, as did

her daughter, Sharonda. Ans. Ex. 2 at 27, 55-57.[1]  His mother and father pledged

their support if he were released, his mother offering him a place to stay, and his

father offering to help him find work with a construction company. Id. at 57-58.

Rounds also has maintained relationships with his wife, Cassandra, and his three

daughters, from prison, and plans to reside with them if released. Id. at 48, 52-53.

Rounds testified that his childhood lacked "stability" and that this

contributed to his crime. Id. at 23-25.  However, he did so in the context of

reflecting on what had gone wrong in his life up until he committed the murder and

the wrongfulness of his criminal acts. As Rounds testified, "by me keeping things

inside of me, and all of the other things in my life as far as my past history of my

mother and situation with the Guyana Tragedy, and a lot of other things that I

didn't never [sic] really just deal with, I think I allowed that to affect all of that . . .

. I let a lot of that come out that day . . . ." Id. at 25-26.  Rounds testified that he

should have coped with his problems by seeking help at the time, suggesting that

he was at some distance from the problematic relationships that plagued him in the

past. See id. at 26.

---

[1] Thomas Graham and his family also submitted a letter strongly opposing Rounds' parole. Ans. Ex. 2 at 72-74.

14

1    Although the issue is close, the Board's reliance on Rounds' "history of

2    unstable relationships" is an unreasonable application of California's "some

3    evidence" requirement. 28 U.S.C. § 2254(d)(1). As the California Supreme Court

4    explained, "due consideration of the specified factors [for parole suitability]

5    requires more than rote recitation of the relevant factors with no reasoning

6    establishing a rational nexus between those factors and the necessary basis for the

7    ultimate decision—the determination of current dangerousness." In re Lawrence,

8    190 P.3d at 552 (internal quotation marks omitted). Although the Board may base

9    a parole denial on "immutable facts" like a history of unstable relationships, "some

10   evidence will support such reliance *only* if those facts support the ultimate

11   conclusion that an inmate continues to pose an unreasonable risk to public safety."

12   Id. at 560. The "some evidence" requirement is "unquestionably deferential, but

13   certainly is not toothless." Id. at 552.

14    No rational nexus links the immutable facts of Rounds' tumultuous

15   childhood with his current dangerousness. At most the Board found that Rounds'

16   unstable past paved the way for this commitment offense and not any potential

17   dangerous behavior if Rounds were released. See Ans. Ex. 2 at 87. In addition,

18   Rounds testified that he regretted how he allowed his past to lead him to violence,

19   and the record indicated that he has sought to repair his relationships with his

1     family and build a new family of his own.  Given these facts, Rounds' unstable

2     social past does not provide "some evidence" of his danger to others.

### 3.     Disciplinary record

4        The Board also cited Rounds' disciplinary record as a basis for his parole

5     denial.  <u>See</u> CAL. ADMIN. CODE tit. 15, § 2402(c)(6) (providing that "serious

6     misconduct in prison or jail" is a factor tending to indicate parole unsuitability).

7     The Board found that Rounds had "started into a disciplinary [sic] free period after

8     a record that, although, [sic] it is only four 115s[,] all of them are serious 115s, the

9     most recent in 2001 for conduct that leads to violence."  Ans. Ex. 2 at 88.   The

10     short-hand "115" refers to California Department of Corrections Form 115 Rule

11     Violation Report.  The four rule violations at issue involved Rounds' possession of

12     weapons contraband in May 1984; an attempt to assist an inmate in concealing a

13     weapon in November 1984; disrespectful behavior toward a correctional officer in

14     April 1986; and conduct which could lead to violence in June 2001.  Ans. Ex. 2 at

15     37-44.

16        The Board relied primarily on the 2001 rule violation as an indicator of

17     Rounds' dangerousness.  To the extent the Board also relied on the rule violations

18     from the 1980s, their connection to Rounds' present dangerousness is tenuous

19     given their remoteness in time, absent some link to present dangerousness.  Indeed,

1    Rounds was discipline-free from 1986 to 2001.  See Cooke, slip op. at 20 (holding

2    that "two minor and non-violent occurrences, which occurred in 1992 and 1993,

3    cannot reasonably be viewed as evidence that Cooke posed an unreasonable risk to

4    public safety in 2002, especially has he had been discipline-free for nearly a

5    decade").

6            As read by the Board at the parole hearing, the rule violation report by the

7    prison guard describes the June 2001 incident as follows:

8            There was a plan of action to place all black inmates on lock down
9            status due to a riot involving seven inmates.  As I approached Rounds
10           in his dorm and informed him of the expectations of the lock down
11           plan, he took a large step toward me, and stood about six inches from
12           my face and stated . . . "You are a racist, and you don't know who the
13           fuck you're dealing with.  I don't give a fuck about the lock down." . .
14           . . I ordered Rounds to step back, but he did not comply.  I then
15           ordered Rounds to turn around so I could place him in mechanical
16           restraint, [sic] after several attempts to get Rounds to comply with my
17           order he finally did so.

18

19   Ans. Ex. 2 at 41-42.  Because Rounds' "gains in disciplinary free behavior [were]

20   relatively recent," the Board concluded that Rounds "need[ed] additional time to

21   ensure this Panel and the public that [he] will maintain [his] gains and that [he] will

22   in fact . . . not be a public safety risk.  Ans. Ex. 2 at 89.

23          The 2001 violation, combined with the nature of Rounds' commitment

24   offense, provides "some evidence" for the Board's finding of parole unsuitability.

1    Although a reviewing court might contest the weight the Board assigned to the

2    violation, which did not include any actual acts of violence, the court's "inquiry

3    strictly is limited to whether some evidence supports the [Board's] assessment . . .

4    not whether the weight of the evidence conflicts with that assessment." In re

5    Rosenkrantz, 59 P.3d at 219.  As a result, the Board did not misapply California's

6    "some evidence" requirement, much less apply it in an unreasonable manner.

7    Rounds' challenge to the Board's determination fails.[2]

8    **II.   WHETHER THE STATE VIOLATED DUE PROCESS BY ALLOWING THE**
9    **PROSECUTOR AND APPOINTED COUNSEL TO PARTICIPATE IN THE PAROLE**
10   **HEARING (CLAIM 4) AND BY FAILING TO DESIGNATE ROUNDS A**
11   **REPRESENTATIVE FROM THE DEPARTMENT OF CORRECTIONS (CLAIM 2)**
12
13   Rounds' remaining claims do not call for significant discussion.  First,

14   Rounds argues that the state violated due process by allowing the prosecutor and

15   Rounds' appointed counsel to participate in his parole hearing and by failing to

16   designate a person to be present at his parole hearing to ensure that all relevant

17   facts were presented and all factual disputes were resolved.  Pet. at 5, 6; Pet. Memo

---

[2] Although the Board properly denied Rounds parole eligibility, it appeals that Rounds meets many of the factors tending to show eligibility for parole, including age, signs of remorse, lack of "any significant history of violent crime," "realistic plans for release" and "marketable skills that can be put to use upon release," and "[i]nstitutional activities" that "indicate an enhanced ability to function within the law upon release."  See CAL. ADMIN. CODE tit. 15, § 2402(d); see also Ans. Ex. 2 at 87-88.  Rounds was also assessed as presenting a low risk of danger in 2003.  Ans. Ex. 2 at 88.

18

1    at 5-6, 9-10.

2          As an initial matter, the state argues that the court lacks jurisdiction over

3    these claims because they raises issues of state, and not federal, law.  Ans. at 11-

4    12; see also 28 U.S.C. § 2254(a).  Although the court in Hayward declined to

5    address the issue, the California parole statute could create a cognizable liberty

6    interest under state law in parole that triggers the protections of procedural due

7    process.  See CAL. PENAL CODE § 3041(b).  California's procedural safeguards,

8    including certain rights to counsel and an independent representative at parole

9    hearings, could be required as a matter of federal due process law and thus provide

10    the federal predicate for habeas jurisdiction.  See CAL. ADMIN CODE tit. 15

11    § 2256(c); PENAL CODE § 3041.5(a)(3).

12          Assuming without deciding that these claims raise issues of federal law,

13    Rounds' claims can be easily denied on the merits.  Rounds argues that (1) the

14    participation of the prosecutor at his parole hearing violated due process because it

15    was not authorized by statute; (2) he was denied an independent representative

16    from the DOC in violation of the statute and due process; and (3) his appointed

17    counsel was an inadequate substitute for the DOC representative to which he was

18    entitled and thus could not cure the constitutional wrong.  Pet. Memo at 5-6, 9-10;

19    Reply 17-20.

19

1        As an initial matter, Rounds misapprehends the operation of the parole

2    statute and regulations.  California Administrative Code title 15 §§ 2256(c),

3    2270(e) afford appointed counsel to indigent life prisoners.  Section 2030(a)(3) in

4    turn allows prosecutors to participate in parole consideration hearings for life

5    prisoners.  California Penal Code § 3041.5(a)(3) requires the participation of a

6    DOC representative "[u]nless legal counsel is required by some other provision of

7    law," and did not apply to Rounds.  Thus, the state did not violate the parole statute

8    and regulations, but adhered to them faithfully.  More importantly, Rounds'

9    allegations fail to state a due process claim.  In essence, Rounds attacks the state

10   for complying with procedures intended to protect his interests in a meaningful

11   parole hearing.  Rounds' claims fail.

12   **III.   WHETHER THE BOARD RE-CHARACTERIZED ROUNDS' OFFENSE AS FIRST-**
13   **DEGREE MURDER IN VIOLATION OF HIS DUE PROCESS RIGHTS (CLAIM 1)**
14
15       Rounds argues that, in finding him unsuitable for parole, the Board treated

16   his offense as a first-degree murder conviction, as opposed to the second-degree

17   offense to which he pled guilty.  Pet. at 5; Pet. Memo at 2-4.  Rounds specifically

18   argues that the Board "extract[ed] additional punishment from the second degree

19   murder matrix level" that structures parole determinations.  Pet. Memo at 3.

20       The Board did not treat Rounds' offense as first-degree murder for the

1   purposes of determining parole.  Rather, it deemed him unsuitable for parole in the

2   first place under the factors set forth at California Administrative Code title 15,

3   § 2402.  In addition, as the state argues, the regulations require that the Board

4   consider the facts of the crime in determining parole suitability, including facts that

5   may tend to prove first-degree murder.  See CAL. ADMIN CODE tit. 15,

6   § 2402(c)(1).

## IV.   WHETHER ROUNDS' CONTINUED INCARCERATION VIOLATES THE EIGHTH AMENDMENT (CLAIM 3)

10   Rounds argues that the Board's procedures "pose a substantial risk" of

11   subjecting him to a sentence that is grossly disproportionate to his crime and

12   thereby violate his Eighth Amendment rights.  Pet. at 6; Pet. Memo at 7-8.

13   However, the imposition of a life sentence for murder, even without the possibility

14   of parole, is not constitutionally disproportionate.  Harris v. Wright, 93 F.3d 581,

15   584 (9th Cir. 1996).  This claim is without merit.

## V.   WHETHER THE STATUTE ALLOWING CONSIDERATION OF VICTIM STATEMENTS CONSTITUTE INVALID LEGISLATIVE AMENDMENTS TO AN INITIATIVE (CLAIM 5)

19   Rounds argues that California Penal Code §§ 3042(f), 3043, which authorize

20   the Board to consider victim statements, constitute an invalid legislative

21   amendment to an initiative in violation of the California Constitution and his due

1    process rights.  Pet. 6; Pet. Memo at 11-12.  Rounds "may not, however, transform

2    a state-law issue into a federal one merely by asserting a violation of due process."

3    Rather, this court must "accept a state court's interpretation of state law, and

4    alleged errors in the application of state law are not cognizable in federal habeas

5    corpus."  Langford v. Day, 110 F.3d 1380, 1389 (9th Cir. 1996).  See also 28

6    U.S.C. § 2254(a).  Because Rounds has failed to raise a cognizable issue of federal

7    law, his claim is dismissed.

8

9            **IT IS ORDERED**

10           Because the Board's finding of parole unsuitability was supported by "some

11   evidence," claim 6 of the petition is denied.  Claims 1-4 are also denied, and claim

12   5 is dismissed.[3]

13

14   Dated: June 25, 2010          M Margaret McKeown

15                                 HON. M. MARGARET McKEOWN

16                                 UNITED STATES CIRCUIT JUDGE

17                                 Sitting by Designation

---

[3] On June 5, 2009, Rounds filed a request for certification of an interlocutory
appeal of this court's order staying proceedings pending the issuance of Hayward
or, in the alternative, a vacatur of the stay. [Dkt # 14].  This request is denied as
moot.